**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
:
JAMES SANFORD, et al.,            :      CIVIL ACTION
:
                    Plaintiffs,   :
:
          v.                      :      No. 08-2849
:
MICHAEL CICCONE, et al.,          :
:
                    Defendants.   :
_____:

HENRY S. PERKIN,
UNITED STATES MAGISTRATE JUDGE                    January 13, 2009

<u>**MEMORANDUM**</u>

In this diversity case, Plaintiffs were the exclusive operators of the Coplay Quarry ("the Quarry") located in Coplay, Whitehall Township, Pennsylvania, under an Option Agreement ("Option Agreement") entered into between Plaintiff James Sanford ("Sanford") and Defendants Michael Ciccone ("Mr. Ciccone") and Steven Kolbe ("Mr. Kolbe") in early 2006.[1]  A dispute arose between the parties concerning the Option Agreement, and Defendants locked Plaintiffs out of the Quarry.  Litigation then ensued concerning the parties' rights and obligations under the Option Agreement.  Presently before this Court is Plaintiffs' Emergency Motion to Enforce Settlement Agreement and to Reinstate Litigation Pursuant to Local Rule 41.1(b) and for Temporary,

---

[1]Mr. Sanford is the principal owner of Plaintiffs Corsan Technologies, Inc. and Elite Management, Inc.  Mr. Kolbe is a member of Defendant Coplay Quarry, LLC and president of Coplay Aggregates, Inc.  Both companies are run out of the Quarry.  Mr. Ciccone is also a member of Defendant Coplay Quarry, LLC and a principal of Coplay Aggregates, Inc.

Preliminary and Permanent Restraints Against Defendants filed on September 3, 2008 (Dkt. No. 40),[2] the Response and Memorandum in Opposition (Dkt. Nos. 44, 45), Plaintiffs' Supplemental Brief in Support of their Motion to Enforce the Amended Settlement Agreement (Dkt. No. 50), a September 12, 2008 letter from Susan Ellis Wild, Esquire supplementing Defendants' arguments (Dkt. No. 51), and a second September 12, 2008 letter from Ms. Wild in response to Plaintiffs' Supplemental Brief (Dkt. No. 52). To resolve this matter, I must determine whether the parties reached an enforceable agreement as a result of settlement discussions reached before me on July 17, 2008.

I.   **FACTUAL BACKGROUND**.

   A.      **The Relationship Between the Parties**.

      Under the early 2006 Option Agreement, in consideration for payments of $200,000, Defendants Mr. Ciccone and Mr. Kolbe

---

[2]The full title of Plaintiffs' Motion is Plaintiffs' Motion to (i) Reinstate Litigation Pursuant to Local Rule 41.1(b) and to Enforce the Settlement Agreement, and (ii) for Temporary, Preliminary and Permanent Restraints against Defendant.  By agreement of the parties and by Order of the Honorable James Knoll Gardner dated September 5, 2008, Plaintiffs' Motion was withdrawn to the extent it sought temporary, preliminary and permanent restraints against Defendants.  Accordingly, the Motion remains operative only to the extent that the Motion seeks to reinstate litigation and enforce the settlement agreement.

      I conducted a two-day hearing on the Motion on September 9 and 10, 2008.  On October 8, 2008, Judge Gardner entered an Order, based upon the parties' consent, for me to conduct all proceedings and enter an adjudication in accordance with 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure and Rule 72.1(III)(b) of the Rules of Civil Procedure for the United States District Court for the Eastern District of Pennsylvania with regard to Plaintiffs' Motion to Reinstate Litigation Pursuant to Local Rule 41.1(b) and to Enforce the Settlement Agreement.  This matter had been previously referred to me by Judge Gardner to hold a settlement conference.

granted Mr. Sanford an option to acquire a 50% interest in the Quarry.  Mr. Sanford was provided the assignable and exclusive rights to operate the Quarry and to dump "clean fill" into the Quarry.  Following execution of the Option Agreement in 2006, Mr. Sanford undertook operation of the Quarry and arranged for various customers of Mr. Sanford to dump "clean fill."  In or around late 2007, Mr. Sanford sent a letter of intent to Messrs. Ciccone and Kolbe expressing his desire to exercise his rights under the Option Agreement to purchase the 50% interest in the Quarry and, in addition, to purchase the remaining 50% interest in the Quarry not covered by the Option Agreement.  Messrs. Ciccone and Kolbe responded by insisting that the Option Agreement was no longer in force or effect, and provided a notice of default on December 10, 2007, asserting that Mr. Sanford was in default of the Option Agreement by failing to provide the required performance bond and/or insurance in accordance with the Option Agreement.  On January 10, 2008, Messrs. Ciccone and Kolbe sent Mr. Sanford a purported notice of termination.

    Although Mr. Sanford disagreed that he was not in compliance with the insurance requirements of the Option Agreement, he continued his negotiations with Messrs. Ciccone and Kolbe, and Plaintiffs continued to operate the Quarry in accordance with the terms of the Option Agreement without protest by Defendants.  In early 2008, Messrs. Sanford, Ciccone and Kolbe

entered into an agreement that, among other things, Mr. Sanford would pay Messrs. Ciccone and Kolbe $5,000,000 as the net purchase price, without offsets, for 100% fee ownership of the Quarry.

In or around May 16, 2008, Messrs. Ciccone and Kolbe demanded significantly higher sums to purchase the Quarry and maintained that the Option Agreement was no longer in force or effect. After rejecting Mr. Sanford's offer to continue to make payments under the Option Agreement, Defendants agreed to place into an escrow account, pending resolution of the parties' dispute, a $1.00 per ton credit to be applied towards the purchase price upon exercise of the option. Defendants barred Plaintiffs' entry into the Quarry.

Thereafter, Plaintiffs proposed a stand-still agreement which would allow Plaintiffs access to the Quarry in accordance with the Option Agreement, pending Court resolution of the parties' dispute. Defendants rejected this proposal.

On June 18, 2008, as a result of Defendants' rejection of Plaintiffs' stand-still proposal, Plaintiffs filed their Complaint alleging that Defendants were in breach of the Option Agreement. In addition to seeking monetary damages, the Complaint sought preliminary and permanent injunctive relief to

compel Defendants to abide by the terms of the Option Agreement.[3] On June 24, 2008, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction Against Defendants. On June 30, July 1, July 2 and July 10, 2008, the Honorable James Knoll Gardner held four days of hearings on Plaintiffs' request for an injunction.

**B.     Settlement Discussions and Agreement.**

Settlement conferences were held by me on July 14 and 17, 2008.  Late in the day on July 17, 2008, the parties agreed to settle their disputes.  On July 18, 2008, the parties placed the terms of the Settlement Agreement on the record before me in the Courtroom.  Under the terms of settlement, Plaintiffs continue to be the exclusive operators of the Quarry and hold an option to purchase the Quarry.  I directed my Deputy Clerk to enter an order on July 18, 2008 dismissing the action pursuant to Local Civil Rule 41.1(b), specifically stating, "[t]he Court intends to retain jurisdiction for 90 days from now, and any settlement agreement is approved and made a part of the record and this Order for enforcement purposes."

Defendants were represented during the settlement negotiations by Susan Ellis Wild, Esquire and Anne Manley, Esquire, of Gross McGinley, LLP.  James L. Reich, Esquire of

---

[3]The Option Agreement gave Mr. Sanford the exclusive right to dump "approved materials" at the Quarry.  Plaintiffs' Complaint and Request for Injunctive Relief were precipitated by Defendants' closure of the Quarry gates, thereby preventing dumping of materials at the Quarry.

Karess, Reich & Furst who also represented Defendants, attended part of the hearings held before the Honorable James Knoll Gardner, and was called by the Defendants as a fact witness during the hearing before Judge Gardner.  Mr. Reich was present for part of the July 14, 2007 settlement conference, but he did not participate at all during the July 17, 2008 conference, at the end of which the parties agreed to settle their disputes.  Mr. Reich was not present on July 18, 2008 when the settlement terms were placed on the record.  Mr. Reich's partner, Martin Karess, Esquire, did not participate in any phase of the settlement negotiations on July 14 and 17, 2008, and was also not present on July 18, 2008.

At the July 18, 2008 hearing, the following terms of settlement were placed on the record by Ms. Ellis Wild:

> This settlement contemplates a full resolution of all matters raised in the complaint, as well as in the plaintiff's motion for a TRO and preliminary injunction.  As part of this settlement, the plaintiff agrees to dismiss a Lis Pendens which has been filed both in the Federal Court and in the Court of Common Pleas of Lehigh County.

> From this point forward, the option agreement between the parties which is referenced in the complaint in this matter and which had been executed by the parties in or around February of 2006 shall be declared null and void.  The parties will forthwith enter into a new written agreement which shall embody the terms of their agreement as reached orally yesterday, July 17th, 2008, and as set forth on this record.

> And, for purposes of putting this on the record only, I will refer to that written agreement as the license agreement, although the actual title may be changed, amplified, or otherwise when we actually create the document itself.

> The parties agree that James Sanford shall have an exclusive

6

license to dump Pennsylvania DEP approved clean fill in the licensed area and otherwise use the licensed area subject only to any limitations set forth herein.  The owners, Ciccone, and Kolbe, and Coplay Quarry, LLC, shall retain the right and duty to approve all materials coming onto the site during the period of the license.

The licensed area will be defined as two quarry holes which are outlined on an -- on a document which is a map, Your Honor, that the parties have both reviewed and approved and which I will mark as Exhibit A to this settlement proceeding.

The quarry owners will provide Sanford with access to the licensed area of the quarry as that is shown on Exhibit A. But, Sanford will provide dust control for all operations inside and outside the licensed area. Areas other than the licensed area of the quarry shall remain in the control of the owners.  However, during the period of the license, the owners agree not to process soils under the Quonset hut without the written permission of Sanford.

The existing rights of the owners' current tenant, Orica, O-R-I-C-A, will not be changed, and Orica remains the tenants of the owners.

The owners give permission for the licensee to pursue permits with the Pennsylvania DEP for the placement of C&D (phonetic) fines, F-I-N-E-S, and regulated fill at the quarry.  Permits and application for permits will be assigned to Coplay Quarry, LLC in the event of a default or termination or upon the expiration of the option if it is -- if the property is not purchased by Mr. Sanford.

Sanford may, without any prior approval by Ciccone or Kolbe, subcontract his rights under the license of Corsan Technologies and/or Elite Management.  However, the owners' relationship under this agreement is only with Sanford. And, all activities conducted by his affiliated companies do not remove, modify, or alleviate Sanford's responsibilities or duties under this agreement.

Sanford has the exclusive right to dump within the licensed area and must, at all times, conform to the Pennsylvania DEP management of clean fill policy and the consent order and agreement dated September 13, 2005.  And, that document, Your Honor, has previously been marked in this litigation as plaintiff's Exhibit number 7.

And, Sanford will otherwise comply with all other applicable Pennsylvania DEP and other governing body regulations. Failure to do so will be a material default under this

7

agreement.  In the event of the death of any party, that
party's interest under the license agreement shall pass to
his estate.

In connection with Sanford's exclusive rights to dump clean
fill, the parties agree as follows: There shall be a minimum
annual quota of 125,000 tons prorated as necessary in the
event of an extension under the terms of the license
agreement.

Sanford shall pay the sum of $3 per ton, except as otherwise
set forth herein when I talk about the insurance provisions,
with no credits given from those payments to meet any other
obligation hereunder, for example, against the ultimate
purchase price.

The quarry shall invoice Sanford weekly for the actual total
tonage [sic] dumped the previous week, but in no event less
than the minimum weekly tonage [sic] calculated as follows:

125,000 tons, which is the annual quota, divided by 52
weeks, would equal 2,404 tons weekly, times $3 per ton,
results in a weekly minimum invoice of $7,212.

Invoice payment terms shall be 45 days with 5 additional
days to cure in the event of nonpayment within the 45-day
period.  After 45 days, Sanford shall pay a penalty of $250
per day until full payment is received.  In the event
payment is not made by the end of the 5-day cure period in
any -- in any period of time, including the appropriate
penalty, Sanford shall be in material default under the
license agreement.

Past due payments for invoices already submitted under the
parties' former option agreement, approximately $115,000,
shall be paid on the effective date of the license
agreement.  Sanford shall not have access to the quarry
until the payment of those past due invoices is made.

In connection with the license agreement and no later than
30 days after the effective date of the parties' agreement,
Sanford shall secure an insurance policy as follows:
An owner's pollution liability insurance policy with limits
of $1M per occurrence, $2M in the aggregate site specific to
Coplay Quarry.

The following shall be named insureds under the policy:
Steven Kolbe, Michael Ciccone, James Sanford, and Coplay
Quarry, LLC.  All parties will sign the application for
insurance.  The cash amount of any deductible under the
policy shall be paid by Sanford upon issuance of the policy
and shall be held in escrow by my law firm, Gross, McGinley,

LLP, said escrow to be governed by the terms of an escrow agreement which would become an exhibit to the written license agreement.

The policy shall be issued by a company rated A or better by Best's.  A 2-year tail to the policy must be quoted at the time of issuance of the policy and must be purchased by Sanford at the end of the term of the license agreement if the quarry is not purchased by him.

A complete copy of the policy and the application for the policy shall be provided to Steven Kolbe and Michael Ciccone within 30 days of the effective date of this agreement.

Failure to secure insurance in accordance with the foregoing terms within 30 days shall constitute a material default under the parties' agreement.

During the period that Sanford is awaiting issuance of the insurance policy and until the insurance policy is provided in accordance with the foregoing terms, Sanford shall pay $5 per ton for all dumping rights.  And, that is a modification to the earlier provision, Your Honor, of the price being $3 per ton.  This is intended only to apply during the period until suitable insurance is secured in accordance with the terms hereof.

For a period of one year from the effective date, Sanford shall have the option to purchase 100 percent of the quarry, except four acres as specifically set forth in the license agreement, for the sum of $6.5M.  The one-year term may be extended only as follows:

It may be extended for a maximum of three additional 90-day terms, for a total of 270 days, each such extension to require a separate $100,000 payment from Sanford to the owners prior to the extension commencing.  Any payment for an extension shall be credited against the purchase price of $6.5M only if closing occurs.  All payments for extensions are otherwise non-refundable.

The parties hereby acknowledge and agree that they have not settled a material dispute between them which has to do with the costs of cleanup of the quarry as set forth in paragraph 2F of the original option agreement.  And, they hereby agree that that dispute may be submitted by either party to binding arbitration by a single arbitrator who shall be selected by counsel of the parties based upon Your Honor's recommendations as to the identity of that arbitrator.

In the event of such arbitration, each side shall bear his own costs of arbitration and shall not recover any costs

from the other side.  Any arbitration award must be paid within five days of the award, and failure to pay it shall constitute a material default under this agreement.

The license agreement shall be governed by Pennsylvania law. And, any disputes thereunder shall be submitted to binding arbitration to be conducted by three attorney arbitrators, one selected by each of the parties and the third selected by the two chosen arbitrators.

There shall be a fee shifting provision for the prevailing party in the event of any disputes that are submitted to binding arbitration, other than this dispute relating to the cleanup costs in paragraph 2F which I've already addressed.

In the event Sanford or the quarry receives DEP approval or permits for the disposal of regulated fill or C&D fines, Sanford shall exercise his option to purchase under this agreement within 90 days of the grant of such approval or permits, said 90 days not to be subject to any extension.

Failure to purchase within 90 days after permits or approval are given by DEP shall constitute a material default.

Sanford shall execute an indemnification agreement as further security for his obligations under this agreement. And, that indemnification agreement shall also be attached as an exhibit to the license agreement.

Sanford shall have immediate access to the quarry as of the effective date of the agreement.  And, all time sensitive events under this agreement shall be triggered as of that effective date, including but not limited to securing insurance and the payment of past invoices.

The effective date shall be the date the written agreement is signed or the date Sanford commences dumping at the quarry, which ever first occurs.  All obligations hereunder commence with that effective date.

Kolbe and Ciccone shall not interview [sic] with any relationships that Sanford may have with his employees, truckers, or customers.  Sanford shall have the right to represent to his customers that the quarry is under new management.

The owners agree that the quarry will be renamed to a mutually acceptable new trade name within a reasonable period of time after execution of the license agreement.  No formal corporate or other filings shall be required of the owners at this time.  The idea there being that, if Sanford purchases the quarry, he's obviously free to name it

anything he wishes and to make the appropriate corporate
filings and so forth.  But, the owners wish to be able to
continue to use their current corporate information and
filings.

Any material default under this agreement shall constitute a
default of the entire agreement, and the agreement shall be
immediately terminated with no further rights accruing to
either party.

Tr. 7/18/08, pp. 4-12.  In addition to these terms, Mr. Kirchner

added the following, with responses by Ms. Ellis Wild:

    I just have a few things to add.  I have no dispute or
issue with anything that Ms. Wild just put on the record.  I
would add that -- a couple of things.  In addition to the
right of James Sanford to apply to the Pennsylvania DEP for
permits for C&D fine and regulated fill, James Sanford shall
also have the right to apply to the DEP for any other
general permits related to the quarry, subject to the
approval of the owners who -- who must sign off on any such
application.

MS. WILD: So agreed.

MR. KIRCHNER: There is a -- an ongoing right of first
refusal of an entity, and I forget the name of the entity.
But, I think we ought to put that on the record that --

THE COURT: Can we -- can we come up with the name of the
entity?

MS. WILD: Eastern Industries.

MR. KIRCHNER: Eastern Industries, Your Honor.  This
agreement -- the owners' rights in the quarry are subject --
I believe -- I believe 50 percent of the quarry is subject
to a right of first refusal by Eastern Industries.

This agreement is contingent upon the owners' ability to
secure either a waiver, release, or some other form of
discharge of that obligation, which the owners agree to do
immediat -- to seek immediately.  And, I believe it takes 30
days to accomplish that.  So, this -- this agreement will
remain contingent upon that event being satisfied, which we
expect will happen within 30 days.  The agreement is also
subject to or contingent upon the owners' ability to resolve
a law suit that is pending brought by Holbeth (phonetic)
Industries, LLC.  That law suit is pending in the Superior
Court of New Jersey, Atlantic City.  And, I can report to
the Court that it -- I believe it is settled, but it has not

11

yet been documented.

And, so, again, that should not be a -- an impediment to the settlement. But, since Holbeth industries, in its law suit, claims it's entitled to certain rights, ownership rights in the quarry, that is a potential cloud on title to the quarry and could affect this settlement. So, I think we should indicate that -- that the settlement is also contingent upon the successful resolution of that law suit. Do you have any objection to that?

. . . .

MR. KIRCHNER: Thank you. I want to make it clear on the record that there will be no penalty and this will not be a default under the agreement if either the Eastern Industries claim or the Holbeth -- Holbeth, LLC claim is not resolved successfully. However, the agreement is contingent upon the successful resolution of both of those claims.

But, I want to make it clear that, in the event that either one of them or both of them are not resolved successfully, this settlement will become null and void. But, there will be no right of action by either party against each other.

MS. WILD: This agreement will become null and void, not the settlement.

MR. KIRCHNER: The agreement will become null and void, yes. I also want to add that the indemnification agreement that counsel referred to will be either identical to or similar to the indemnification agreement that was attached as an exhibit to the option agreement.

My client informs me that the parties have agreed that James Sanford shall have the right to put a trailer on the site at a site to be approved by the owners. And, then fin -- I don't know, did you cover the four acre parcel, Susan and the –

. . . .

MR. KIRCHNER: Okay. There was reference to a four acre parcel which has actually been subdivided and separated from the quarry property, but which is located contingent to and as part of the quarry property. That -- that parcel will be controlled by the owners of the Coplay Quarry.

But, there's a hole on that site. And, the parties have agreed, as part of this settlement, that, if that hole is to be filled, it would be filled by material brought in by James Sanford at the same prices that the parties have

agreed to in this agreement.  I think that's all I have,
Your Honor.

MS. WILD: That's agreed.

. . . .

MS. WILD: Oh, excuse me.  As to that four-acre parcel, that
last provision applies only so long as it remains under the
ownership of the current owners.

. . . .

MR. KIRCHNER: Or an entity controlled by them.

MS. WILD: That's correct.

MR. KIRCHNER: Understood.

Id., pp. 12-16.

### C.    Conduct of the Parties After July 18, 2008.

Plaintiffs commenced dumping at the Quarry on July 29,
2008, therefore the effective date of the Settlement Agreement
became July 29, 2008.  This effective date triggered Plaintiffs'
duty to obtain insurance, and pursuant to the Settlement
Agreement terms, Plaintiffs were obligated to secure insurance on
or before August 28, 2008.  Id. at 8-9.  It is undisputed that no
insurance policy was in place by midnight, August 28, 2008.  Tr.,
9/9/08, p. 8.  Thus, Defendants barred Plaintiffs from operating
at the Quarry for the second time on August 28, 2008.

On September 3, 2008, Plaintiffs filed the instant
Emergency Motion to Enforce Settlement Agreement and to Reinstate
Litigation Pursuant to Local Rule 41.1(b) and for Temporary,
Preliminary and Permanent Restraints Against Defendants.

Defendants again retained Susan Ellis Wild, Esquire, and Anne Manley, Esquire, both of whom have remained Defendants' counsel in this action.[4]

By agreement of the parties and by Order of the Honorable James Knoll Gardner dated September 5, 2008, Plaintiffs' Motion was withdrawn to the extent it sought temporary, preliminary and permanent restraints against Defendants. Accordingly, the Motion remains operative only to the extent that the Motion seeks to reinstate litigation and enforce the settlement agreement.

I conducted a two-day hearing on the Motion on September 9 and 10, 2008. At the hearing, counsel argued their respective positions on the Motion and the Response to the Motion. Testimony was presented from Mr. Kolbe and Donna Pantaleo, Vice-President of Financial Operations for Corsan Technologies and Elite Management. Ms. Pantaleo is responsible for the insurance coverage of both entities. Tr., 9/10/08, p. 5.

On October 8, 2008, Judge Gardner entered an Order, based upon the parties' consent, for me to conduct all proceedings and enter an adjudication in accordance with 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure

---

[4]On or about July 23, 2008, Plaintiffs' counsel received a phone call from Ms. Ellis Wild informing him that her firm had been terminated by the Defendants and that the Settlement Agreement would be negotiated by Mr. Reich and his firm. This was confirmed by correspondence dated July 24, 2008 from Mr. Reich.

and Rule 72.1(III)(b) of the Rules of Civil Procedure for the United States District Court for the Eastern District of Pennsylvania with regard to Plaintiffs' Motion to Reinstate Litigation Pursuant to Local Rule 41.1(b) and to Enforce the Settlement Agreement.

## II.  **STANDARD OF REVIEW**.

An agreement to settle a lawsuit, which is voluntarily entered, is binding upon the parties, whether or not made in the presence of the court, and even in the absence of a writing. Green v. John H. Lewis & Co., 436 F.2d 389, 390 (3d Cir. 1970); Ferranti International, PLC v. Jasin, No. CIV.A. 98-CV-5412, 2000 WL 632994, at *6 (E.D. Pa. May 5, 2000)(noting Pennsylvania courts have held even oral settlement agreements enforceable without a written document).  Such a settlement is enforceable summarily, upon motion, by a district court in a case pending before it.  Gross v. Penn Mutual Life Ins. Co., 396 F. Supp. 373, 374 (E.D. Pa. 1975).

It is well settled that "[a] district court has 'inherent authority to enforce agreements settling litigation before it.'" McClure v. Township of Exeter, Civ. A. No. 05-5846, 2006 WL 2794173, at *1 (E.D. Pa. Sept. 27, 2006)(quoting New Castle County v. U.S. Fire Ins. Co., 728 F. Supp. 318, 319 (D. Del. 1989)).  "Provided that the evidence demonstrates that the parties reached an agreement, a district court can enforce the

15

terms agreed upon by the parties." Id.  When the parties
mutually assented to the terms and conditions of the settlement
at the time they made the agreement, the evidence is sufficient
to support the enforcement of a settlement agreement.  Wyndmoor
Learning Ctr. v. City of Wilmington, No. CIV.A. 93-4217, 1996 WL
117471, at *6 (E.D. Pa. Mar. 12, 1996).  "[A] settlement
agreement is still binding even if it is clear that a party had a
change of heart between the time he agreed to the terms of the
settlement and when those terms were reduced to writing." Id.

**III. <u>DISCUSSION</u>.**

        Plaintiffs move to enforce the agreement reached at the
July 18, 2008 settlement conference because under the Agreement,
Plaintiffs continue to be the exclusive operators of the Quarry
and hold an option to purchase the Quarry.  Plaintiffs contend
that the Defendants have reneged on the Settlement Agreement, and
the Defendants claim that the Settlement Agreement is terminated.
Defendants contend, conversely, that because Plaintiffs are in
breach of the insurance requirements under the Settlement
Agreement, the settlement is terminated.

        In response to the Defendants' arguments, Plaintiffs
note that the primary provision in the Settlement Agreement is
the insurance requirement.  As the owners of the Coplay Quarry,
Defendants bear all responsibility to the Pennsylvania Department
of Environmental Protection and other regulatory agencies for any

contamination within the Quarry.  Defendants have no control over
the composition of the fill transported by Plaintiffs from New
York and New Jersey and brought to the Coplay Quarry for dumping.
Therefore, it is critical for Defendants to be adequately secured
by the purchase of an insurance policy by the individuals
responsible for performing the dumping activities, and who have
control over what is dumped therein.  Pls.' Br., pp. 5-6.
Plaintiffs contend that they proceeded in good faith to secure
the necessary insurance within the required thirty day time
period, and they argue that any delay was due to Defendants'
failure to timely respond to and cooperate with Plaintiffs'
insurance broker's efforts to secure the necessary information to
obtain the required insurance.  According to Plaintiffs,
Defendants were in full control of the insurance application
process from July 25, 2008 to August 29, 2008.  Plaintiffs also
contend that the Defendants insisted upon secrecy in their
dealings with insurance agent David Quinn and delayed the
application process by at least one day.  Thus, according to
Plaintiffs, the owner's insurance application process was delayed
by one day.  Defendants dispute this claim.

The question of whether a settlement occurred is
governed by state law.  Tiernan v. DeVoe, 923 F.2d 1024, 1032-33
(3d Cir. 1991).  It is undisputed that Pennsylvania law applies
to this dispute, and both parties rely on Pennsylvania law in

17

support of their positions.  Bankers Trust Co. v. Bethlehem Steel
Corp., 752 F.2d 874, 882 (3d Cir. 1984)(stating applicable law is
law of jurisdiction with most interest in the dispute).

**A.   Whether the Settlement Agreement Constitutes An
Enforceable Contract.**

The question in this case is essentially whether the
parties reached a settlement at the July 18, 2008 settlement
conference, despite the actions or inactions that took place
afterward.  The answer to this question is not difficult on these
facts.  The fact that Plaintiffs were unable to secure
appropriate insurance that included all parties as named
insureds, and Defendants agreed to a subsequent modification of
this provision, such that the named insureds would only include
Steven Kolbe, Michael Ciccone and Coplay Quarry, LLC, in order to
avoid an "insured v. insured" problem in the event of a claim,
does not change the fact that there was a meeting of the minds at
the July 18, 2008 conference.

The July 18, 2008 Settlement Agreement constituted an
enforceable contract.  The transcript of the July 18, 2008
settlement conference demonstrates that the parties mutually
assented to the terms and conditions of the settlement at the
time they made the agreement, therefore the terms agreed upon by
the parties may be enforced.  Wyndmoor Learning Ctr., 1996 WL
117471, at *6.

18

B.      **Whether the Settlement Agreement Was Breached**.

Defendants argue that the Plaintiffs, in not obtaining insurance on or before August 28, 2008, breached the Settlement Agreement, thereby rendering it terminated and without further effect.  Alternatively, they seek to enforce the Settlement Agreement exactly as entered into on July 18, 2008.

In Plaintiffs' Motion and Brief, Plaintiffs concede that their deadline to secure the insurance was August 28, 2008.  Pls' Br., p. 2.  At the hearing on September 10, 2008, Ms. Pantaleo testified on direct examination that she was told by Mr. Sanford that the insurance requirement was waived, but this waiver was not confirmed by the Defendants, as follows:

> Q.   Okay.  Ms. Pantaleo, were you aware of the requirement in the settlement agreement of July 18 that the insurance coverage be in place within thirty days of the effective date of the settlement agreement?
>
> A.   Yes.
>
> Q.   Okay.  And did you understand when the effective date -- did you understand what the effective date was?
>
> A.   Yes.
>
> Q.   Okay.  What was your understanding of the effective date?
>
> A.   The effective date would have been the first day we began shipping material or a signed agreement, whichever came first.
>
> Q.   And which came first?
>
> A.   The shipping day.
>
> Q.   Do you recall the date on that?
>
> A.   July 29th.

Q.   Okay.  Now, you testified about numerous phone
conversations with Mr. Quinn during the period from July
25th to August 27, and you said that the common purpose of
most of those calls was to seek updates on the status of the
insurance application.  Did you ask Mr. Quinn specifically
for information during those phone conversations?

A.   Yes.

Q.   Okay.  What did you ask for?

A.   I asked for where the process was, when we would be
receiving a policy and when the approval would be coming
through.

 Q.  Did Mr. Quinn respond to your questions?  Without
revealing what he said, did he respond?

A.   Yes.

Q.   Okay.  Based on those conversations, did you reach an
understanding as to when you thought the insurance policy
was going to be issued?

A.   No.

Q.   Knowing, as you did, that there was a thirty-day clock
ticking starting from the effective date, which you said was
July 29, did you reach a conclusion that this might be an
issue if the insurance coverage was not put into place
within that thirty-day time period?

A.   I had a misunderstanding of the different changes that
came through with the different requirements of the
insurance and what impact that had on the thirty-day time
period.

Q.   Okay.  Could you explain -- what do you mean when you
say you had a misunderstanding?

A.    Well, we -- Corsan Technologies had stated that we
couldn't take material into the quarry until we had the
insurance in place 'cause we couldn't afford to pay the five
dollars a ton on our existing contracts.  And when the
policy -- the application changed on who had to file the
application.  I didn't know what kind of time frame that
that would have on us with not being able to complete the
application myself.

Q.   Okay.  So are you saying -- were you confused about the
deadline?

20

A.   I don't know if it's confused but I may have come up with another opinion on the deadline.

**Q.   Okay.  Well, did you have discussions with Mr. Sanford about whether the deadline had been changed?**

**A.   Yes, I did.**

**Q.   And did you reach a conclusion at that time that the deadline had been changed?**

**A.   Yes, I did.**

**Q.   Okay.  Did you talk to anyone at Coplay Quarry to confirm that?**

**A.   No.**

**Q.   Is there a reason why not?**

**A.   Mr. Sanford was having the conversat – the communication back and forth with Coplay Quarry.**

Tr., 9/10/08, pp. 20-22 (emphasis added).  On cross-examination,

however, she testified that:

Q.   Have you ever reviewed the transcript of the settlement agreement that was entered into in this courtroom on July 18th?

A.   Yes.

Q.   When -- when was the first time you saw that?

A.   I don't remember exactly.

Q.   Was it before this week?

A.   Yes.

Q.   Okay.  When was it in relation to the time that Corsan resumed dumping at Coplay Quarry on July 29th?  Had you seen the transcript by that time?

A.   No.

Q.   Okay.  When was it -- can you tell me when it was in relation to that?

A.   Maybe a week or two after that.

21

Q.    Okay.  Who informed you of what the insurance terms
were of the settlement agreement?  You indicated that you
got a call from Mr. Bober on July 18th, correct?

A.    Yes.

Q.    And was that after the settlement had been read into
the record in this courtroom?

A.    Yes.

Q.    That was when the proceeding was over and done with?

A.    Yes.

Q.    But you had been consulted prior to July 18th about
those insurance terms, isn't that fair to say?

A.    Yes.

Q.    Because you needed, and when I say "you" I mean you and
Mr. Bober and Mr. Sanford and Corsan, needed to make sure
that you weren't agreeing to something that you weren't
going to be able to do, isn't that fair to say?

A.    Correct.

Q.    And you're the person at Corsan who deals with
insurance issues, correct?

A.    Yes.

Q.    Is it fair for me to assume, then, that you were
consulted by Mr. Bober or Kirchner or Mr. Sanford about what
could and could not be agreed to on behalf of Corsan with
respect to the insurance?

A.    Yes.

Q.    Okay.  Well, let me ask you this.  When you finally saw
the settlement agreement, as it was reduced to writing in
transcript form, was there anything in there that surprised
you about the insurance provisions?

A.    Yes.

Q.    What was that?

A.    That the owners policy named everybody insured and that
they locked me into thirty days.

Q.    And that what?

22

A.    They locked me into thirty days.

Q.    Okay.  So when you saw the settlement transcript, that was the first that you became aware that there was a requirement that everybody be named on a policy, including James Sanford, right?

A.    Yes.

Q.    And that was also the first that you became aware that there was a thirty-day provision for obtaining that insurance?

A.    Yes.

Q.    And that was a week or two after Corsan resumed dumping at Coplay Quarry on July 29th?

A.    That was the first time I read it in the transcripts that way.

Q.    Okay.  What did you do when you became aware of those two provisions that you hadn't previously been aware of?

A.    I shared with my boss, Mr. Sanford, that we couldn't begin dumping until we got the insurance because I have no control over how long an insurance company takes to award a policy.

Q.    I thought you told me a few minutes ago that Sanford had already started dumping at the quarry before you ever saw the transcript of the settlement agreement.

A.    You asked me when I saw the transcript.

Q.    Right.

A.    Okay.  When I was told by others was at a different time.

Q.    When were you told by others?

A.    When they came out of court around the 18th.

Q.    All right, now I'm thoroughly confused.  Maybe it's just me, but I thought you told me a few minutes ago that when you saw the transcript -- I asked you was there anything that surprised you in the transcript concerning the insurance coverage, and I believe your answer was two things surprised you.  One was that everybody had to be on the policy.

A.   Excuse me.  I missed one, about the effective date.  I thought the effective date would have been the date that the agreement was signed.  And it would have been thirty days from the effective date --

Q.   Okay.

A.   -- okay?  And then, when I read the transcripts, it explained that whichever came first, the dumping date or the effect -- or the agreement signature date.

**Q.   Okay.  So when you were first told about the terms of the settlement agreement, you thought you had thirty days from the signing of a written agreement to secure the insurance?**

**A.   That's correct.**

**Q.   And it wasn't until you read the transcript that you understood that the effective date could also be triggered by Corsan resuming dumping?**

**A.   That's correct.**

**Q.   And you read the transcript after July 29th, which was the date that Corsan resumed dumping, so, by the time you read the transcript, the effective date had already been triggered, right?**

**A.   Correct.**

**Q.   Okay.  What did you do when you realized that the effective date had been triggered on July 29th?**

**A.   I questioned Mr. Sanford.**

**Q.   Okay.  What else did you do?**

**A.   That was --**

**Q.   That was it?**

**A.   He answered my concerns.**

**Q.   What did you do about the insurance issue?**

**A.   I continued working on the insurance.**

**A.   Yes.**

**Q.   Did you have any conversations with Mr. Quinn at that point in time about that issue?**

**A.   Yes.**

**Q.   Did you tell him that the time frame needed to be -- that the case needed to be picked up on this because you suddenly realized you had a deadline of August 28th?**

**A.   No, because of a previous conversation I had with Mr. Sanford.**

**Q.   When you first contacted Mr. Quinn on July 18th, did you give him any date by which insurance needed to be in place?**

**A.   I told him immediately.**

**Q.   What did you mean by "immediately"?**

**A.   We had already had our contractors policy.  And when I contacted him on the 18th, it was with the intentions of switching the contractors policy over to an owners policy, and I needed it to take place immediately.**

**Q.   Okay.  Did you define "immediately" for Mr. Quinn?**

**A.   Yes.  He told me he would be able to do it the next day.**

**Q.   And that was -- that didn't happen, did it?**

**A.   No.**

Id. at 25-37 (emphasis added).  Ms. Pantaleo also testified that:

Q.   Okay.  After you became aware that the effective date had been triggered by the commencement of dumping activities on July 29th, did you inform Mr. Quinn of that fact?

A.   No.

Q.   Did you take any action when you realized that the effective date had been triggered on July 29th?

A.   Yes.

Q.   And that was to contact Mr. Sanford, right?

A.   Correct.

25

Q.   Did you take any other action?

A.   **After my communication with Mr. Sanford, I did not believe there was other action to take.**

**Q.   Okay.  Did you contact Mr. Kirchner at all about that issue after you read the settlement agreement?**

**A.   No.  I don't believe I did.**

**Q.   Okay.  Did you have any kind of understanding about whether anybody had ever asked for an extension on that thirty-day period?**

**A.   I had an understanding that that thirty-day period had been waived.**

**Q.   Had been waived?**

**A.   Yes.**

**Q.   Did you ever see anything to indicate that?**

**A.   No, I did not.**

**Q.   That -- what was that based on?  Your conversation with Mr. Sanford?**

**A.   Yes.**

**Q.   You had a specific conversation with Mr. Sanford about this thirty-day period that had started July 29th, and he told you it had been waived?**

**A.   I had a specific conversation with Mr. Sanford in regards to the insurance requirements, including the thirty-day time period.**

**Q.   Well, did you just think that it had been waived or did he tell you it had been waived?**

**A.   He told me.**

**Q.   Did you see anything that indicated that it had been waived, in writing?**

**A.   No.**

**Q.   Did you ever confirm that with anybody else?**

26

A.   Ms. Wild, he's my boss.

Q.   Well, I underst –

A.   I don't question him.

Q.   You've referred to him before as your boss, and I understand that he's, what, president of the company?

A.   Yes.

Q.   But you are the vice president of financial affairs with both companies, correct?

A.   Correct.

Q.   And you do have the day-to-day responsibility for securing insurance, correct?

A.   Correct.

Q.   And you're familiar in your job with all kinds of deadlines that come and go for -- I mean, bills have to be paid on time, right?

A.   Correct.

Q.   Insurance premiums have to be paid by the due date, correct?

A.   Correct.

Q.   Do you make sure that all of that happens and that the trains run on time, so to speak?

A.   Yes, I do.

Id. at 41-43 (emphasis added).  Ms. Pantaleo's testimony evidences Plaintiffs' failure to obtain the requisite insurance by the August 28, 2008 deadline in the Settlement Agreement. Plaintiffs produced no testimony or other evidence showing that Plaintiffs contacted Defendants in the face of an impossibility to obtain the requisite insurance and seek an extension of time

to secure the insurance.  In the absence of such evidence, Plaintiffs' contention that the insurance provision was waived is unpersuasive.

In Plaintiffs' Motion and Brief, Plaintiffs concede that their deadline to secure the necessary insurance was August 28, 2008. See Pls.' Br., p. 2.  Plaintiffs further contend in their Brief that the "requisite insurance was secured by the early afternoon on August 29, 2008." Pls.' Br., p. 3.  Ms. Pantaleo testified to the contrary.  As of the filing of Defendants' Brief in Opposition to the Motion to Enforce on September 8, 2008, there was still no insurance in place under the terms of the Settlement Agreement, and which, by Plaintiffs' own statements, was due to be in place no later than August 28, 2008.

At the September 10, 2008 hearing on the Motion to Enforce, Plaintiffs submitted a binder of insurance but no insurance contract.  Ms. Pantaleo testified that this ensured the necessary coverage for Defendants.  No expert testimony was offered to support Ms. Pantaleo's lay testimony regarding the effect of the binder.  Under the express terms of the Settlement Agreement, Plaintiffs were in breach of the Agreement as of August 28, 2008.

**C.      Other Issues Which May Affect This Decision.**

Plaintiffs contend that, in addition to the insurance

28

coverage issue, this Court must consider other factors in determining whether to enforce the Settlement Agreement.

    1.    <u>Did A Material Modification of the July 18 Settlement Agreement Occur to Change Plaintiffs' Deadline To Obtain Insurance Coverage?</u>

By the terms of the July 18, 2008 Settlement Agreement, the "effective date" is the date that the written agreement is signed **or** the date Plaintiffs commence dumping at the Quarry, whichever first occurs.  Tr., 7/18/08, p. 11.  Plaintiffs commenced dumping at the Quarry on July 29, 2008, thereby setting the effective date of the agreement as July 29, 2008.  Defs.' Br., p. 3 n.2 (citing Pls.' Br., p. 7.).

The key term in the July 18, 2008 Settlement Agreement concerned insurance coverage for the disposal operations at the Quarry.  After July 18, 2008, Plaintiffs were unable to secure the appropriate EIL (Owner's) pollution liability insurance that included all parties, including Mr. Sanford, as named insureds.  Thus, Defendants agreed to a modification of this provision, such that the named insureds would only include Mr. Kolbe, Mr. Ciccone and Coplay Quarry, LLC, in order to avoid an "insured v. insured" problem in the event of a claim.  Tr., 9/9/08, p. 76.

Plaintiffs argue that the necessary changes in the identity of the named insureds effectuated a modification of the terms of the Settlement Agreement, extending the thirty-day period of time for securing insurance coverage to an unspecified

29

length of time.  Plaintiffs also argue that:

> under the doctrine of necessary implication, the parties'
> agreement to amend the Settlement Agreement to require a
> form of insurance that had to be applied for by the
> defendants - and not the plaintiffs - necessarily implies
> that plaintiffs no longer bore the duty to ensure coverage
> was in place within thirty days.

Pls.' Supp. Br., p. 4.  They contend that "[t]his implication is
necessary because, following the amendment, the plaintiffs lost
the ability to control the time within which the new insurance
coverage could be put in place and because holding plaintiffs to
that obligation, despite their inability to control it, would
produce an unfair result."  Id.  Plaintiffs lose sight of the
fact that Mr. Quinn was *their* insurance agent, and they still had
an obligation to meet the time deadlines set forth in the
Settlement Agreement.  Plaintiffs' argument that they "lost
control" of the duty to secure insurance within thirty days
fails.

Defendants respond that no evidence exists in the
record to support Plaintiffs' contention that it was impossible
to obtain an Owners' Pollution Liability Insurance Policy that
included the names of all parties as named insureds.  The
insurance broker, Mr. Quinn, did not testify, and his
certification does not say that it was impossible to obtain the
type of policy specified in the Settlement Agreement.  Rather,
his certification says that Hudson Insurance Company was
unwilling to write such a policy.  Quinn Certification, ¶7.

Later, he states that "it made better sense to look at a separate
EIL policy for the owners of the quarry . . . ." <u>Id.</u>, ¶9.  Mr.
Quinn then looked to Ms. Pantaleo for direction on how to proceed
and learned that he should find a separate EIL policy for
Defendants.   <u>Id.</u>  Mr. Kolbe testified that he was informed by
someone from Plaintiffs that it would be necessary to apply for
the policy without including Mr. Sanford as a named insured.  He
testified that he went along with applying for the policy without
Mr. Sanford because it did not matter to him whether or not Mr.
Sanford was a named insured.  He specifically testified:

> Q:  And you understood that to be a problem that came about
> because the insurance company was unwilling to do that?
>
> A.  Yeah.  I think that was the gist of the e-mail coming
> back from Mr. Kirchner, that they had a problem with it.
>
> Q.  And what was your response to that?
>
> A.  Mr. Caress [sic] called us up, we reviewed it real
> quickly.  The first option to have us as additional insured
> gave us absolutely no peace of mind what so ever.  The
> second option was that we would be the sole named insureds
> and we said that would be fine, that we'd accept that.  And
> Jimmy Sanford's name did not have to be on it, it didn't
> really make any difference in the first place.  To us, it
> was a no brainier. [sic]  We said fine.  We'll go ahead, you
> supply the policy, you pay for it, we'll fill out all the
> applications and whatever, and we'd be happy to go.

Tr., 9/9/08, p. 76.

        Defendants also contend that Plaintiffs are mistaken in
their belief that this modification caused an extension of the
thirty-day period of time for securing insurance to an
unspecified length of time.  To the extent that Plaintiffs

contend that there was a subsequent modification to the
Settlement Agreement, Defendants note that in order for a verbal
contractual modification to be valid, some valid consideration
proven by clear, precise and convincing evidence must be produced
to support this modification.  Here, no evidence of any
consideration has been produced.  Moreover, Plaintiffs mistakenly
argue that removing Mr. Sanford from the policy caused the
Plaintiffs' duty to apply for and obtain insurance to transfer to
Defendants.  Rather, the duty to facilitate obtaining the
insurance remained with the Plaintiffs and was not transferred to
Defendants.

       2.   <u>Delay in Preparation of Written Document</u>.

      Plaintiffs contend that Defendants unduly delayed the
preparation of a written document to memorialize the Settlement
Agreement.  Defendants contend that this allegation is patently
untrue, extraneous, and of no bearing on the instant issue
because the timing of a written document embodying the Settlement
Agreement would have been important only in the event that it was
used as the starting point or "effective date" of the settlement
between the parties.  As set forth in the July 18, 2008
Transcript, the effective date was to be the date the written
document was signed, or the date Plaintiffs commenced dumping at
the quarry, which ever first occurred.  All obligations under the
Settlement Agreement were to commence with that effective date.

Tr., 7/18/08, p. 11.  Plaintiffs' own court filings in this
matter concede that they resumed dumping at the Quarry on or
about July 29, 2008, therefore the thirty-day period expired on
or about August 28, 2008.  Pls.' Br., p. 7.

      3.   <u>Whether Time Was of the Essence To This
          Agreement</u>.

      Defendants contend that, while the exact phrase "time
is of the essence" was not used in the July 18, 2008 colloquy,
the language of the transcript makes it clear that time was of
the essence in securing insurance pursuant to the Settlement
Agreement.  The Settlement Agreement contains the following
provision:

> Sanford shall have immediate access to the quarry as of the
> effective date of the agreement.  And, all time sensitive
> events under this agreement shall be triggered as of that
> effective date, including but not limited to securing
> insurance and the payment of past invoices.
>
> The effective date shall be the date the written agreement
> is signed or the date Sanford commences dumping at the
> quarry, which ever first occurs.  All obligations hereunder
> commence with that effective date.

Tr., 7/18/08, p. 11.  In response, Plaintiffs argue that the
Agreement did not specifically provide that time was to be of the
essence with regard to the thirty-day requirement to secure
insurance.

      Plaintiffs argue that the language of the Settlement
Agreement is not exact and state that "[t]he simple insertion of
a deadline to secure insurance does not in and of itself make
time of the essence under Pennsylvania law."  Pls.' Supp. Br., p.

7 (citing <u>Easton Theatres, Inc. v. Wells Fargo Land and Mortg.</u>
<u>Co., Inc.</u>, 401 A.2d 1333 (1979)).  Plaintiffs cite Pennsylvania
case law dealing with land sale contracts in which courts have
held that time is not of the essence in a contract unless it is
expressly stated in the contract.  Because "time is of the
essence" is not expressly stated in the July 18, 2008 transcript
of the Settlement Agreement, Plaintiffs argue that they were not
required to obtain the insurance within thirty days of the
effective date of the Agreement.  Plaintiffs also argue that
"although the Settlement Agreement did state, generally, that
failure to satisfy the insurance requirements under the
Settlement Agreement was considered to be material, the time
deadline was not specifically agreed to be of the essence."  <u>Id.</u>

Defendants note that the specific words "within 30
days" appear in three separate places on page 8 of the
Transcript.  First, when Defendants counsel stated, "in
connection with the license agreement and no later than 30 days
after the effective date, [Plaintiffs] shall secure an insurance
policy."  Tr., 7/18/08, p. 8.  The second appearance is the
statement that "a complete copy of the policy and the application
for the policy shall be provided to Steven Kolbe and Michael
Ciccone within 30 days of the effective date of this agreement."
<u>Id.</u>  Finally, "[f]ailure to secure insurance in accordance with
the foregoing terms within 30 days shall constitute a material

default under the parties' agreement." Id. at 8-9.  This
language evidences the parties' intent and agreement that there
would be a maximum of 30 days for the Plaintiffs to secure an
insurance policy in accordance with the terms of the Settlement
Agreement.  This did not occur.  Plaintiffs did not contact
Defendants to discuss any extension of time beyond the agreed-
upon thirty days to obtain the requisite insurance.  Therefore,
Plaintiffs materially breached the Settlement Agreement.

###### D.        The Dumping Tonnage Fees.

Plaintiffs paid to Defendants three dollars per ton of
fill dumped into the Quarry by Plaintiffs or the hauling
companies with whom they contracted.  In addition to the
insurance requirement in the Settlement Agreement, Plaintiffs
also agreed to the following terms regarding dumping tonnage
fees:

> In connection with Sanford's exclusive rights to dump clean
> fill, the parties agree as follows: There shall be a minimum
> annual quota of 125,000 tons prorated as necessary in the
> event of an extension under the terms of the license
> agreement.

> Sanford shall pay the sum of $3 per ton, except as otherwise
> set forth herein when I talk about the insurance provisions,
> with no credits given from those payments to meet any other
> obligation hereunder, for example, against the ultimate
> purchase price.

> The quarry shall invoice Sanford weekly for the actual total
> tonage [sic] dumped the previous week, but in no event less
> than the minimum weekly tonage [sic] calculated as follows:

> 125,000 tons, which is the annual quota, divided by 52
> weeks, would equal 2,404 tons weekly, times $3 per ton,
> results in a weekly minimum invoice of $7,212.

35

Invoice payment terms shall be 45 days with 5 additional
days to cure in the event of nonpayment within the 45-day
period.  After 45 days, Sanford shall pay a penalty of $250
per day until full payment is received.  In the event
payment is not made by the end of the 5-day cure period in
any -- in any period of time, including the appropriate
penalty, Sanford shall be in material default under the
license agreement.

.   .   .   .

During the period that Sanford is awaiting issuance of the
insurance policy and until the insurance policy is provided
in accordance with the foregoing terms, Sanford shall pay $5
per ton for all dumping rights.  And, that is a modification
to the earlier provision, Your Honor, of the price being $3
per ton.  This is intended only to apply during the period
until suitable insurance is secured in accordance with the
terms hereof.

Tr., 7/18/08, pp. 6-7, 9.

On Monday, July 21, 2008, Defendants contacted Ed Bober, Plaintiffs' Vice-President of Operations and on-site representative at the Quarry, who stated that Plaintiffs were in no hurry to resume dumping because Plaintiffs did not want to pay the extra two dollars per ton.  Instead, Plaintiffs wanted to wait until the appropriate insurance was obtained before they resumed dumping.  Mr. Bober also represented that Plaintiffs expected to obtain insurance within a few days.  Based on the fact that Plaintiffs still owed Defendants past dumping fees and Defendants they perceived that Plaintiffs had no incentive to pay these past fees until they resumed dumping, Defendants agreed to forego the extra two dollars in dumping fees, and Plaintiffs agreed on either July 24, 2008 or July 25, 2008 to resume dumping.  On July 29, 2008, Plaintiffs resumed dumping

activities.  Tr., 9/9/08, pp. 72-75.  Based on this agreement between the parties and in order to reflect the parties' meeting of the minds on this issue, Plaintiffs were obligated to pay Defendants $3.00 per ton for fill dumped in the Quarry after July 18, 2008.

## III. <u>CONCLUSION</u>.

The parties reached agreement as to the material aspects of settlement which were placed on the record on July 18, 2008.  A breach of that Settlement Agreement occurred when Plaintiffs did not obtain the requisite insurance within thirty days of the effective date of the Agreement.  Accordingly, Plaintiffs' Motion to Enforce is denied.

An Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
————————————————————————————————————
                                    :
JAMES SANFORD, et al.,              :   CIVIL ACTION
                  Plaintiffs,       :
                                    :
           v.                       :   No. 08-2849
                                    :
MICHAEL CICCONE, et al.,            :
                  Defendants.       :
————————————————————————————————————:
```

<u>**ORDER**</u>

AND NOW, this 13th day of January, 2009, upon consideration of Plaintiffs' Emergency Motion to Enforce Settlement Agreement and to Reinstate Litigation Pursuant to Local Rule 41.1(b) (Dkt. No. 40), the Response and Memorandum in Opposition (Dkt. Nos. 44, 45), Plaintiffs' Supplemental Brief in Support of their Motion to Enforce the Amended Settlement Agreement (Dkt. No. 50), a September 12, 2008 letter from Susan Ellis Wild, Esquire supplementing Defendants' arguments (Dkt. No. 51), and a second September 12, 2008 letter from Ms. Wild in response to Plaintiffs' Supplemental Brief (Dkt. No. 52),

IT IS HEREBY ORDERED that Plaintiffs' Motion is DENIED due to Plaintiffs' failure to fulfill their obligations regarding insurance coverage under the July 18, 2008 Settlement Agreement.

The Clerk of Court is ORDERED to mark this case CLOSED.

BY THE COURT:

*/s/ Henry S. Perkin*
HENRY S. PERKIN
UNITED STATES MAGISTRATE JUDGE